Richard PICKER, Appellant,

v.

SEARCHER'S DETECTIVE AGENCY, INC., et al.

No. 74–1718.

United States Court of Appeals, District of Columbia Circuit.

Argued April 16, 1975.

Decided July 14, 1975.

Rehearing Denied Aug. 15, 1975.

David T. Bryant, Washington, D. C., for appellant.

James E. Brammer, Washington, D. C., with whom James P. Schaller, Washington, D. C., was on the brief for appellee Searcher's Detective Agency.

Samuel Intrater, Washington, D. C., with whom Albert Brick, Washington, D. C., was on the brief for appellee American Numismatic Assn.

Before BAZELON, Chief Judge, FAHY, Senior Circuit Judge, and WRIGHT, Circuit Judge.

Opinion for the Court filed by Senior Circuit Judge FAHY.

FAHY, Senior Circuit Judge:

The American Numismatic Association (ANA), in connection with its annual national convention to be held at a hotel in Washington, D. C., arranged for the display and selling of coins, medals, paper money and like objections during the convention. Appellant Richard Picker, a professional coin dealer, completed an application form supplied by ANA in October 1970, and requested bourse (display and selling) space for his coin and currency collection at the convention, to be held the following August. His application was accepted in March 1971. On the afternoon of August 14, 1971, the last day of the convention, Picker placed his collection in two attache cases and checked them at a security room provided by ANA at the hotel.[1] He returned to repossess the two cases the following day. Delivery was not made, for the two cases had disappeared. He sued appellees ANA and Searcher's Detective Agency, Inc. (Searcher's) in the District Court for the value of the collection, alleged to be $135,000. Searcher's had en-

tered into a contract with ANA under which it would furnish protection at the convention and security room for safekeeping of the displays when not on exhibit. During the convention period employees of both ANA and Searcher's were in attendance at the security room.

Count I of the complaint alleged simple negligence in the failure of appellees to return the goods, Count II gross negligence. The court dismissed the complaint against appellees on Count I.[2] Count II was submitted to the jury, which returned a verdict for appellees. The appeal presents the question whether the claims under Count I should also have been submitted to the jury. We conclude that there were cases for submission to the jury under Count I, and accordingly reverse.

I

■ The delivery of the attache cases to appellees as bailees, and their failure to return the bailed property when duly claimed, raised a prima facie case of negligence under Count I. Quinn v. Milner, 34 A.2d 259 (D.C.Mun.App.1943); Jones v. Warner, 57 Wash.2d 647, 359 P.2d 160 (1961); Banachowski v. Saunders, 187 A.2d 891 (D.C.C.A.1963); Star Pontiac Company, Inc. v. Eastern Insurance Company, 184 A.2d 200 (D.C.Mun. App.1962). Appellees defend that Picker had released them of liability except for $25.00 for each article lost. Two documents are involved in their defense. One is the application form sent by ANA to Picker for participation in the bourse, which he signed and returned in October, 1970; the other is a three-part tag used by the appellees in operating the security room. The fifth of seven paragraphs in the application reads in pertinent part as follows:

A security room will be available for all officially registered ANA members

---

1. Appellant had not used the security room before. On the previous days of the convention he had used other facilities provided by ANA to secure his collection overnight.

2. Prior to submission to the jury of Count II ANA's counsel agreed that Picker should re-

cover $25.00 for each attache case. This was the amount stated on each claim check. When the jury returned a verdict in favor of both appellees the court directed a verdict against ANA alone for $50.00.

during the convention period. Police protection and armed guards will be provided for the bourse and exhibit areas, but users thereof are expected to insure themselves against any loss sustained. The undersigned specifically releases the ANA, its officers, members and/or committees, either in their official, individual or personal capacities by reason of any loss, damage or injury whatsoever sustained, either directly or indirectly in connection with the bourse, security room, exhibit and/or convention.

The tag used at the security room is in three parts, separated by perforations. Two parts contain only identical numbers and a place for the bailor to sign. One of these is signed and placed on the article when it is checked in. The other is retained by the bailor as his claim check and signed when he seeks to repossess the article. The center part, retained by the bailees in the security room file, is signed when the article is presented for safekeeping. This part reads as follows:

> In consideration for permitting me to use without charge the Security Room at the 19...... ANA Convention, I hereby agree that the liability of American Numismatic Association, .......
> ..................................
> and all officers, board members and other representatives of each of them shall be limited to the aggregate sum of $25.00 for loss, theft, damage and/or destruction (through negligence or otherwise) of all property held for me in said Security Room; provided, however, that the foregoing provision shall not limit the liability of any individual who may be personally guilty of theft, willful damage or destruction of my property.

Signature

## II

### The Liability of Searcher's for Simple Negligence

■ 1. Searcher's contends the release of liability clause in the application inures to its benefit and bars recovery for simple negligence. We do not agree. The release clause runs in terms only to "ANA, its officers, members and/or committees, either in their official, individual or personal capacities . . . ." Searcher's is not among these; and the reference to loss sustained "either directly or indirectly in connection with the bourse, security room, exhibit and/or convention" does not enlarge the category of those protected.

■ Searcher's relies also, however, upon the theory that it was an agent of ANA and thus when acting pursuant to its authority it had those immunities of its principal which were not personal to the principal, citing, *inter alia*, Leather's Best, Inc. v. S. S. Mormaclynx, 451 F.2d 800 (2d Cir. 1971). It is there observed in dicta that this is the New York rule in the context of bailments:

> an agent acting within the scope of its authority is entitled to the benefit of any contractual limits upon the liability of its principal.

*Id.* at 817. There is also Ohio authority for such a rule. Employers' Fire Ins. Co. v. United Parcel Service of Cincinnati, Inc., 89 Ohio App. 447, 99 N.E.2d 794, 799 (1950). No District of Columbia case, however, so holds, and the Supreme Court in Herd & Co. v. Krawill Machinery Corp., 359 U.S. 297, 79 S.Ct. 766, 3 L.Ed.2d 820 (1959), has held otherwise. The Court there considered whether the provisions of section 4(5) of the Carriage of Goods by Sea Act (46 U.S.C. § 1304(5)) or parallel provisions of an ocean bill of lading, limiting the liability of an ocean carrier to a shipper to $500 per package of cargo, also limited the liability for negligence of an independent stevedore company engaged by the carrier to load the cargo aboard the ship. The Court pointed out that the bill of lading referred not to the liability of the stevedore or agent but of the carrier. Adverting to the theory which had been adopted in A. M. Collins & Co. v. Panama R. Co., 197 F.2d 893 (5th Cir. 1952), cert. denied, 344 U.S. 875, 73 S.Ct. 168, 97 L.Ed. 677 (1952), the Court found the

premise of that decision to be "that all agents of the carrier who perform any part of the work undertaken by the carrier in the contract of carriage, evidenced by the bill of lading, are, by reason of that fact alone, protected by the provisions of the contract limiting the liability of the carrier, though such agents are not parties to nor express beneficiaries of the contract." 359 U.S. at 303, 79 S.Ct. at 770. The Supreme Court disagreed with this position:

We are unable to agree with that conclusion, for we think it runs counter to a long-settled line of decisions of this Court. From its early history this Court has consistently held that an agent is liable for all damages caused by his negligence, unless exonerated therefrom, in whole or in part, by a statute or a valid contract binding on the person damaged. . . .
In Brady v. Roosevelt S. S. Co., 317 U.S. [575], at page 580–581, 63 S.Ct. [425] at page 428 [87 L.Ed. 471], this Court said that "The liability of an agent for his own negligence has long been embedded in the law," that "withdrawal of the right to sue the agent for his torts would result at times in a substantial dilution of the rights of claimants," and that withdrawal of that right would be "such a basic change in one of the fundamentals of the law of agency [as] should hardly be left to conjecture." This Court has several times held that an agent's only shield from liability "for conduct harmful to the plaintiff . . . is a constitutional rule of law that exonerates him." Sloan Shipyards Corporation v. United States Shipping Board Emergency Fleet Corporation, 258 U.S. [549], at page 567, 42 S.Ct. [386] at page 388 [66 L.Ed. 762]; Brady v. Roosevelt S. S. Co., 317 U.S., at page 584, 63 S.Ct. at page 430. Any such rule of law, being in derogation of the common law, must be strictly construed, for "[n]o statute is to be construed as altering the common law, farther than its words import. It is not to be construed as making any in-

novation upon the common law which it does not fairly express." Shaw v. Railroad Co., 101 U.S. 557, 565, 25 L.Ed. 892; see Texas & Pacific R. Co. v. Abilene Cotton Oil Co., 204 U.S. 426, 437, 27 S.Ct. 350, 354, 51 L.Ed. 553. Similarly, contracts purporting to grant immunity from, or limitation of, liability must be strictly construed and limited to intended beneficiaries, for they "are not to be applied to alter familiar rules visiting liability upon a tortfeasor for the consequences of his negligence, unless the clarity of the language used expresses such to be the understanding of the contracting parties." Boston Metals Co. v. The Winding Gulf, 349 U.S. 122, 123–124, 75 S.Ct. 649, 650, 99 L.Ed. 933 (concurring opinion). (Footnotes omitted.)

359 U.S. at 303–305, 79 S.Ct. at 770. And see, Cabot Corporation v. S.S. Mormacscan, 441 F.2d 476 (2d Cir. 1971), cert. denied, sub nom., John W. McGrath Corp. v. Cabot Corp., 404 U.S. 855, 92 S.Ct. 104, 30 L.Ed.2d 96 (1971).

We adopt this reasoning as controlling. Moreover, as we have seen, the application signed by Picker, like the bill of lading signed by the carrier in *Herd*, expressly enumerated to whom it was intended to apply; and Searcher's, like the stevedore company in *Herd*, was not an ordinary employee of the principal. It was a separate, independent company conducting its own business, with its own employees.

■ Searcher's also relies upon the language we have quoted from the part of the security room tag signed by appellant but retained in the file of the security room. Appellant testified, however, that when he checked his cases the security room was very busy, that he did not read the limitation of liability clause, was not asked to read it, and was not aware of its terms. The part retained by him, as we have noted, contained nothing but a number and place for signature.

We think the court erred in dismissing Picker's claim against Searcher's under

Count I. A hurried transaction of this sort, with no special reference by the bailee to the provision Searcher's relies upon, together with testimony the jury might believe that it was not even read by appellant, places the case in a different setting from contract cases which hold,

> The general rule in this jurisdiction is that one who signs a contract has the duty to read it and is obligated according to its terms . . . .

McNulty v. Medical Service of District of Columbia, Inc., 189 A.2d 125, 128 (D.C.C.A.1963). And see, Julius Garfinckel & Co. v. Firemen's Ins. Co., 288 A.2d 662 (D.C.C.A.1972); Bob Wilson, Inc. v. Swann, 168 A.2d 198 (D.C.Mun.App.1961); Paterson v. Reeves, 113 U.S.App.D.C. 74, 304 F.2d 950 (1962); Cornell & Company v. Barber & Ross Company, 123 U.S.App.D.C. 378, 360 F.2d 512 (1966).

Lucas v. Auto City Parking Co., 62 A.2d 557 (D.C.Mun.App.1948), involved the theft of a car containing certain valuable articles, the loss of which was claimed. The car had been left in a parking lot. One phase of the case involved the contention of the proprietor of the lot, the defendant, that he was not responsible for the loss because of a limitation of liability printed on the claim check. The Court of Appeals stated:

> This court has held that unless a customer knows of the terms of a limitation of liability on a ticket or claim check the limitation is not binding upon him [5] but that when the customer does have knowledge of such terms he is bound thereby.[6] In the circumstances of this case the question as to whether plaintiffs knew of the limitation was one of fact and the judge's

[5] Palace Laundry Dry Cleaning Co. v. Cole, D.C.Mun.App., 41 A.2d 231. See also Dietrich v. Peters, 28 Ohio App. 427, 162 N.E. 753; Langford v. Nevin, Tex.Civ.App., 293 S.W. 673.

[6] Manhattan Co. v. Goldberg, D.C.Mun.App., 38 A.2d 172.

finding thereon must stand, for there was sufficient evidence to support it.

*Id.* at 560. The *Manhattan* case cited in footnote 6 of *Lucas* should be considered in light of the subsequent decision of the same court in Palace Laundry Dry Cleaning Co. v. Cole, 41 A.2d 231 (D.C. Mun.App.1945), also cited in *Lucas*. In *Palace Laundry* the court did not feel bound by its earlier decision in *Manhattan*, and held,

> Here there was undisputed evidence that the customer was without actual knowledge of the company's alleged limitation. Defendant's theory is that she was charged with notice.

41 A.2d at 232.

As to that theory, that one cannot shut one's eyes to the obvious and claim want of notice, the court stated that notice is implied only where, "as in entering into a contract, accepting a receipt, or in like situations," the law imposes a duty to inquire. In circumstances no less helpful to our appellant than to the bailor there, the court held in *Palace Laundry* that knowledge could not be imputed to the claimant.

In Parking Management Incorporated v. Jacobson, 257 A.2d 479 (D.C.C.A.1969), the operator of the parking lot was held liable for damage to the plaintiff's car while in the operator's custody notwithstanding a notice of limited liability posted on the lot. The court stated:

> We hold the trial court did not err in rejecting appellant's contention that it had successfully limited its liability to damage claimed before leaving the parking lot. Plaintiff testified that he was not aware of such a condition of liability when he left the car at the lot. Absent proof that he expressly or impliedly agreed to such limitation at the time of the bailment contract, the effort to limit liability was unilateral and of no effect as between appellant and Jacobson. See Manning v. Lamb, D.C.Mun.App., 89 A.2d 882, 824 . . . . . See also Hallman v. Federal

Parking Services, D.C.Mun.App., 134 A.2d 382, 386 . . . .

*Id.* at 480.[3]

In Hallman v. Federal Parking Services, 134 A.2d 382 (D.C.Mun.App.1957), it is said:

> [W]e are mindful that this court has many times ruled that the printed notice of limitation of liability on the claim check is not binding unless the terms are known to the bailor.[7] The

> [7] Manning v. Lamb, D.C.Mun.App., 89 A.2d 882; Lucas v. Auto City Parking Co., supra [62 A.2d 557]; Palace Laundry Dry Cleaning Co. v. Cole, D.C.Mun.App., 41 A.2d 231.

> complete absence of testimony as to knowledge of the limitation and agreement to it makes any contention of limited liability untenable.

*Id.* at 386.

Manning v. Lamb, *supra* (D.C.Mun. App.1952), involved the loss of personalty in a parked car. With reference to the defense based on a provision limiting liability contained in the claim check and also on a large sign on the premises, the court stated:

> With regard to defendants' contention that the plaintiff was bound to have known the limitation of liability as set forth on the claim check and the sign, this court has held that unless a customer knows of the terms of a limitation of liability on a claim check the limitation is not binding upon him. Lucas v. Auto City Parking Co., D.C. Mun.App., 62 A.2d 557; Palace Laundry Dry Cleaning Co. v. Cole, D.C. Mun.App., 41 A.2d 231; see also Dietrich v. Peters, 28 Ohio App. 427, 162 N.E. 753, 755 . . . .

89 A.2d at 884.

We conclude that as the law has developed in this jurisdiction the testimony as to the manner in which the checking of the two attache cases occurred at the security room, including the testimony of appellant that he did not read and did not know of the limitation of liability written on that part of the tag retained by appellees, although signed by him, raised an issue for the jury on Count I of the complaint as to Searcher's, considered of course with the undisputed fact that the bailed articles taken in custody for appellant at the security room were not returned by the bailee when duly requested. In so concluding we have considered the cases presented by appellees, including *Garfinckel, supra,* and find they are not persuasive to the contrary in light of the factual differences which understandably led the courts in those cases to a different conclusion from that we reach in this case. *Garfinckel* involved the loss of furs stored by Garfinckel for the bailor. As the court said:

> [t]here is no testimony in this case which could support a finding that [the bailor] was not effectively put on notice that the valuation she herself placed on her furs at storage established a ceiling on a potential liability of Garfinckel's.

288 A.2d at 665. It is in this factual context that the court also stated:

> It is well settled in this jurisdiction that a bailee for hire can limit his liability by contract . . . .

*Id.*

We decide the case respecting the liability of Searcher's without regard to the application of Picker of October, 1970, and its acceptance by ANA in March, 1971. We thus limit our consideration of Searcher's defense to the actual transaction of bailment when the attache cases were checked at the security room. Accordingly, language in the formal contract cases cited by Searcher's which bear upon a contractual release or limitation of liability are not the criteria for decision as to Searcher's. The question turns upon whether Picker knew or in the circumstances of the checking of the attache cases should be charged with knowledge that Searcher's would be required to pay only $25.00 for each at-

**3.** *See also,* Dumlao v. Atlantic Garage, Inc., 259 A.2d 360, 362 (D.C.C.A.1969).

tache case it failed to return when duly requested rather than its actual value. We think the evidence required the question to be submitted to the jury.[4]

## III

### The Liability of ANA for Simple Negligence

■ Recognizing that if Picker was bound by the release of liability clause in the application form, or by the limitation clause of the tag used at the security room, gross negligence on appellees' part would not be excused, the District Court submitted the issue of such negligence to the jury. The result, as we have noted, was a verdict exonerating ANA and Searcher's of gross negligence.[5] The question remains whether the court erred in entering a verdict for appellant against ANA for $50.00, thus limiting to that amount Picker's recovery from ANA for simple negligence, instead of also submitting that issue to the jury.

ANA relies upon the application letter signed and submitted by Picker in October, 1970, and its acceptance by ANA in March following, the convention to be held in August. We have noted that in the fifth of its seven paragraphs, the application refers to the availability of a security room, and states that police and armed guards would be provided for the "bourse and exhibit areas, but users thereof are expected to insure themselves against any loss sustained," no reference here being made to loss by the security room. Then comes the clause relied upon by ANA, that the applicant releases ANA of liability "by reason of any loss . . . in connection with the bourse, security room, exhibit and/or convention."

In ANA's March acceptance of the application mention was again made of a security room but there was no reference to a release of liability, although, in contrast to this omission, the acceptance communication called special attention to ANA's regulations governing the convention. Moreover, actual arrangements at the security room itself also omitted reference to the terms of the application. As we have noted, the part of the security room tag retained in the files there provided that the liability of ANA and "all officers, board members and other representatives of each of them shall be limited to the aggregate sum of $25.00" for loss of an article there.

We have held in Part II that the arrangement for, and the evidence with respect to the actual bailment at, the security room, did not obviate the need for submitting to the jury the issue of Searcher's liability for the true value of the two attache cases lost there. We noted in that connection that Picker testified he did not read or know of the provision printed on the portion of the tag retained by the bailees, although he had signed it.

With respect now to ANA, the use at the security room of the tag purporting to limit ANA's liability for loss to $25.00 for each article, long after the October application had been accepted, with no reference in the interim to its total release of liability clause, gives rise to a confused and uncertain factual situation as to the total arrangements with ANA respecting a loss at its hands. The application form provides for complete release of liability; the security room arrangements set out a monetary limit, and the efficacy of that limit turns upon the evidence concerning the actual circumstances at the time of the bailment.

4. Searcher's says that as the stipulated agent of ANA it was a "representative" of ANA and, therefore, under the terms of the central part of the security room tag its liability is limited to $25.00 for each attache case lost. We think the claim against Searcher's must be decided by the jury consistently with the position we have explained in this Part II of the opinion. Such representative status as Searcher's might have as agent of ANA does not relieve it of responsibility for its own negligence in the operation of the security room unless Picker is found by the jury, under the standard we have stated to govern such finding, to have limited Searcher's liability to $25.00 for each article lost.

5. See footnote 2, *supra.*

ANA does not rely on what occurred then, basing its defense for actual loss due to simple negligence solely upon the terms and acceptance of the application. Nevertheless, Picker's case against ANA does involve the actual bailment at the security room conducted by ANA and Searcher's. The two factual phases of the over-all relationship between ANA and Picker as well as the two documents must be considered. For reasons similar to those set forth in Part II respecting the case against Searcher's,[6] it follows that an issue for the jury is involved in the case against ANA insofar as the circumstances of the actual bailment are concerned. When to these circumstances is added the evidence residing in the application itself, and its acceptance, considered with Picker's testimony,[7] together with the history of the application from its signing in October to the time of the loss of the attache cases in August, the jury issue embraces an enlarged evidentiary setting. None of the contract cases relied upon by ANA requires withholding from the jury the issue thus raised.[8] None involved a contract of bailment where, as here, property is actually given into the possession of another for safekeeping and is lost by the bailee.[9] This is not to say that a jury issue is presented in all cases involving the effect of liability limitation clauses in bailment contracts. The trial court may properly remove such an issue from the jury and hold for the bailee as a matter of law when, despite the bailor's denial, his knowledge of the liability clause can clearly be imputed from the facts and the confounding issues of this case are not present. *Cf. Garfinckel, supra.*

The decisions of the courts to which we have referred give no clear guide to the terms in which the issue in this evidentiary situation should be submitted to the jury. Factual differences have led to variations in the details of standards used to decide particular cases. The courts have not infrequently tailored the rule which governed a decision in a particular case so as to justify acceptance of the conclusion reached by the fact-finder.

In this case we do not attach great weight to a factor sometimes deemed important, arising from inequality of bargaining power of the bailor compared with that of the bailee. That aside, there runs through the decisions, and studies of the subject, in varying degrees, an unwillingness to accept readily the position that a bailee has relieved himself of liability for loss of the bailor's property due to negligence. Public policy has played a part in this approach to the law. There is, however, a competing consideration. It is referred to in *Palace Laundry, supra,* as the argument that "one may not shut one's eyes to the obvious and claim want of notice," qualified by the court in *Palace Laundry* itself as applicable only where there is a duty to inquire. 41 A.2d at 232.

The difficulty often encountered in formulating an applicable rule is illustrated by the present case. It calls for applying to facts which do not supply an answer with certainty an amalgam of conflicting principles, each designed to aid toward a just result. The answer, however, is not clear enough to be given by the court as legally required. It should be given by the jury, and upon

---

**6.** See discussion of *Lucas, supra; Palace Laundry, supra; Hallman, supra; Manning, supra,* and *Parking Management Incorporated, supra,* 169 U.S.App.D.C. at pp. ———, 515 F.2d at pp. 1319–1321.

**7.** Picker stated he did not recall reading or being aware of the provisions of the fifth paragraph, adding that he had attended a number of such conventions and had never known of a release of liability for loss such as was here contained in the application.

**8.** Paterson v. Reeves, *supra;* Cornell & Company v. Barber & Ross Company, *supra;* Bob Wilson, Inc. v. Swann, *supra;* McNulty v. Medical Service of District of Columbia, Inc., *supra.*

**9.** As pointed out earlier, during the convention employees of ANA were in attendance, along with Searcher's personnel, at the security room.

**1324**

the basis of a factual situation enlarged as we have indicated beyond that involved in the case of Searcher's. This difference in the evidence to be considered by the jury leads us to a somewhat different formulation of the standard to govern the jury's deliberations. We think it should be stated as follows: to determine on the whole evidence whether it was or was not brought home to Picker with reasonable clarity that ANA was not to be accountable for the actual loss Picker might suffer through ANA's negligence in caring for the bailed attache cases.

Reversed and remanded for further proceedings not inconsistent with this opinion.